UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WAYNE MORRIS WALLACE,

        Petitioner,                        Case Number 03-CV-10115-BC
                                                    Honorable David M. Lawson

v.

THOMAS K. BELL,

        Respondent.
_____/

## OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS, AMENDING CASE CAPTION, AND DENYING MOTION FOR APPOINTMENT OF COUNSEL

The petitioner, Wayne Morris Wallace, an inmate at the Parr Highway Correctional Facility in Adrian, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that he is incarcerated in violation of his constitutional rights. The petitioner has also filed a motion for appointment of counsel. Wallace was convicted of second-degree criminal sexual conduct following a jury trial in the Wayne County Circuit Court in 1999 and sentenced as a second habitual offender to a term of eight to seventeen years imprisonment. The charges arose from claims of sexual abuse of an eleven-year-old boy. At the time the petitioner instituted this action, he was confined at the Gus Harrison Correctional Facility where the original respondent, David Jamrog, was the warden. Thomas K. Bell is currently the acting warden at the Parr facility, which also is within the jurisdiction of the Michigan Department of Corrections. The Court, therefore, will amend the caption of the case to reflect the name of the petitioner's current custodian.

The petition raises claims that the petitioner was denied his rights under the Due Process Clause because the trial court called its own witness against the defendant and demonstrated judicial bias, the state trial judge improperly curtailed the petitioner's attorney's questioning of a juror whose

wife had been the victim of sexual abuse, and the petitioner's trial attorney did not furnish constitutionally effective assistance of counsel. These claims were raised in and rejected by the state court of appeals. As the to first claim, the court of appeals determined that the trial judge demonstrated bias, but it found the error to be harmless. This Court finds that the state court's decision was contrary to clearly established federal law, however, because judicial bias is a structural error that is not amenable to a harmless error analysis. The petitioner's other claims lack merit. Nonetheless, the Court is constrained to issue the writ on the strength of the petitioner's first claim.

I.

Wallace's conviction stems from a charge that he sexually assaulted eleven-year-old Victor Bartolo at Wallace's residence in Detroit, Michigan on July 2, 1998. The prosecutor claimed that Wallace rubbed his penis on Bartolo's buttocks and ejaculated on him while in bed with him and Wallace's son during a sleep-over. Wallace claimed that he had a "wet dream" while sleeping and that no sexual contact occurred.

During jury *voir dire*, defense counsel asked juror Steven Miller whether he had any experience with a child who was alleged to have been sexually abused. Miller responded that he had not. He also stated that nothing he had heard about the case would interfere with his ability to decide the case fairly. Defense counsel did not question Miller further and passed him for cause. However, when the prosecutor thereafter asked Miller if any close friends or family members had been the victim of sexual abuse, Miller responded that his wife had been sexually abused by a family member when she was ten or twelve years old, but this had not resulted in a court proceeding. Defense counsel subsequently requested permission to ask Miller additional questions on grounds

the juror gave a different answer to essentially the same question, but the trial court refused the request because he had already passed the juror for cause. *See* Trial Tr. Vol. I at 114-23. Defense counsel chose not to exercise a peremptory challenge on Miller, but proceeded to exhaust his peremptory challenges on other jurors. Miller remained on the jury. *See id*. at 169.

During trial, the victim, Victor Bartolo, testified that he was a friend of the petitioner's son, ten-year-old Jordan Wallace. On the night of the incident, the petitioner took the two boys to a drive-in movie. The petitioner gave Bartolo an alcoholic beverage called Apple Pucker, which made him feel woozy. On the way home from the movie, the petitioner stopped at a store to buy beer, liquor, and lighter flints. The three of them proceeded to the petitioner's residence, also the home of his mother who was asleep in her bedroom. The petitioner made an alcoholic mixed drink and gave Bartolo a can of beer, which he did not like. The petitioner, Bartolo, and Jordan went into the bedroom to watch television and sleep. All three of them were on the bed in their boxer shorts. Jordan Wallace wanted to sleep next to Bartolo, but the petitioner told him "you'll sleep where ever I tell you to sleep" and laid down between the two boys. *See* Trial Tr. Vol. II at 46.

Bartolo fell asleep. He said that he woke up around 5:00 a.m., found his boxers pulled down, and felt the petitioner's penis rubbing against his buttocks. Bartolo testified that he felt "[s]omething like soft and then its'[sic] hard and then, um, my butt's all wet and then I get out the – it's like something soft but it's kind of hard, too. And then, um, I get out the bed and go to the bathroom." *Id*. at 49. He also saw baby oil near the bed. Bartolo confirmed that the petitioner did not penetrate him. Bartolo got up and went into the bathroom to clean himself, but had difficulty wiping the liquid substance off of himself. When he returned to the bedroom, the petitioner and Jordan Wallace had changed positions on the bed. The baby oil was gone. Bartolo woke up Jordan Wallace

-3-

and told him that he was sick and wanted to go home. Jordan Wallace woke up the petitioner who agreed to take Bartolo home. Bartolo testified that he insisted that Jordan Wallace go with them because Bartolo was afraid. When they arrived at Bartolo's home, Bartolo told his mother that he did not feel well. After the Wallaces left, Bartolo told his mother that the petitioner "did something nasty" to him and began shaking and crying. He then told his mother what had happened and she called the police. Bartolo was taken to the police station where he gave a formal statement, and then he was taken to the hospital for an examination.

Candice Combs, Victor Bartolo's mother, recounted Bartolo's description of the incident and described her contact with the authorities. She also testified that she gave the police the clothes that her son was wearing that evening. Police Officer Daniel Cretu testified that he responded to the scene, that Bartolo reported the assault, and that he subsequently arrested the petitioner.

Jordan Wallace testified that on the night of the alleged incident, he went to the drive-in, a store, and his grandmother's house with his father and Bartolo. He said his father gave them some Apple Pucker to drink at the movie and gave Bartolo a beer at home. When they first went to bed, the petitioner was between him and Bartolo. Jordan Wallace then sat on the floor to watch a movie before returning to bed between the petitioner and Bartolo. He never saw the petitioner rub up against Bartolo. Jordan was asleep until Bartolo woke him up and told him that he was sick and wanted to go home. Jordan testified that Bartolo asked him to accompany him the petitioner and offered Jordan a lighter flint. Bartolo seemed shaky and scared. When Jordan Wallace returned home, he noticed that the bed was made.

Forensic serologist Jeff Rolands of the Detroit Police Department Forensic Services Division testified that an examination of the seat area of Bartolo's boxer shorts revealed the presence of

-4-

semen. Rolands did not determine the age of the stain, however DNA testing indicated that the semen on Bartolo's clothing matched the petitioner's DNA.

The prosecution rested its case. The trial court then called senior forensic serologist Paula Lytle as its own witness. Lytle was a supervisor in the Detroit police crime laboratory who happened to be observing her "protegee," Jeff Rolands, as he testified. The trial court had made a sequestration order at the beginning of the trial, and defense counsel asked for a side bar conference so he could object to the court's action, but the trial judge refused the request and directed defense counsel to address the court in front of the jury. Defense counsel protested that the witness had not been listed, and he claimed surprise. Nonetheless, the trial judge proceeded to question Ms. Lytle about the history and development of the forensic science division, its expertise in DNA testing, and the cost of its DNA testing equipment. Lytle provided background information about her division and how it works. The judge's questioning concluded as follows:

    Q:   Do you folks know what you're doing?
    A:   Yes, we do.
    Q:   Are you good at it?
    A:   Yes, we are.
    Q:   In your opinion?
    A:   Yes.

Trial Tr. Vol. III at 60. The trial court then remarked: "My only purpose [of calling the witness] is so that the jury can have some idea of the competency of the Detroit Police Department's Forensic Services Section." *Ibid.*

Neither the prosecutor nor defense counsel posed any questions to this witness. Defense counsel objected to the court's conduct outside the jury's presence and requested curative action. In response, the trial court read to the jury Michigan Rule of Evidence 614, which authorizes a trial

court to call and question its own witnesses and permits the parties to object outside the jury's presence. The trial court further instructed the jury as follows:

> The Court called Ms. Lytle. Two reasons: One, she's here. She was here observing her protege. The Court is familiar with Ms. Lytle and has been, for as long as she's been associated with the department. And [knows] that she is aware of how her section functions, what her section does, how it does it.
>
> Questions of that nature, I don't think could be successfully posed to any witness you've heard from in this case thus far. In no way, shape or form are you to understand the Court as endorsing or impeaching or otherwise characterizing any witness you've heard from.
>
> Most lay persons, I believe, are relatively un-uninformed as to a very complex subject that has been discussed with you. Um, referred to as DNA. You're again reminded that any question of fact in his case is for you to decide, not me.
>
> I, in no way intended or intend to comment or characterize the testimony of any witness from whom you've heard. Is that clear to you?

Trial Tr. Vol. III at 66-67.

The petitioner then testified in his own defense. He denied giving alcohol or beer to Victor Bartolo or to his own son. He also denied exposing his penis or intentionally touching Bartolo. Instead, he testified that he had a "wet dream" while lying in the bed and that he must have made "some kind of incidental contact somehow" with Bartolo. On cross-examination, the petitioner admitted telling the police that he did not ejaculate on Bartolo and admitted that he did not mention having a "wet dream."

The following exchange occurred during the prosecutor's cross-examination of the petitioner:

> Q: Mr. Wallace, didn't you tell your wife you got up in the middle of the night, went downstairs to watch a porno flick, masturbated and you must've had your semen on you when you came upstairs, because there was nothing to wipe up the semen with on the entire first floor or second floor bathroom. And then you walked in your bedroom, grabbed something that was laying

-6-

>   on the floor or dresser and wiped your semen with it and that's how you left your semen, your semen is somehow connected with this crime?
> A.   I don't recall that, no.
> Q.   But if you did, that's the third explanation now?
> A.   I don't recall me having a conversation with her about that.
> Q.   My question to you, if you did, that's the third and different explanation of what happened, isn't it, sir?
> A.   If I did, it would've been, I guess.

Trial Tr. Vol. III at 158-59. Defense counsel did not object to this line of questioning. The petitioner subsequently claimed the marital privilege, precluding his wife from testifying at trial.

At the close of trial, the court instructed the jury about the elements of the offense and other matters. The trial court's instructions included the following:

> You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge. My comments, rulings, questions, and instructions are also not evidence. It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case.
>
> However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of facts. And you should decide this case from the evidence.

Trial Tr. Vol. IV at 8-9.

The jury found the petitioner guilty of second-degree criminal sexual conduct. The trial court subsequently sentenced him as a second habitual offender to a term of eight to seventeen years imprisonment.

Following sentencing, the petitioner filed a motion for new trial or resentencing in the trial court. The trial court granted the motion as to a sentencing issue and issued an amended judgment of sentence, but denied the motion in all other respects.

The petitioner then filed an appeal of right in the Michigan Court of Appeals raising the following claims:

> I. The trial court violated the petitioner's due process rights by unfairly restricting *voir dire* of a juror whose wife was molested as a child, where he was being tried for similar charges.
>
> II. The trial court violated the petitioner's due process rights by calling its own witness to bolster the credibility of the Detroit Police Department's DNA expert.
>
> III. Defense trial counsel was constitutionally ineffective for failing to object to the prosecutor cross-examining the petitioner about an alleged contradictory statement to his wife concerning the circumstances of the incident, where the statement was privileged.

The Michigan Court of Appeals affirmed the petitioner's convictions and sentence. *People v. Wallace*, No. 222159, 2001 WL 1512081 (Mich. Ct. App. Nov. 27, 2001) (unpublished). The petitioner filed a delayed application for leave to appeal in the Michigan Supreme Court raising the same claims, which was denied. *People v. Wallace*, 467 Mich. 869, 651 N.W.2d 918 (2002). His motion for reconsideration was also denied. *People v. Wallace*, 467 Mich.869, 655 N.W.2d 557 (2002).

The petitioner then filed the present habeas corpus petition asserting the same claims raised in the Michigan appellate courts. The respondent filed an answer to the petition asserting that it should be denied for lack of merit. The petitioner has filed a reply to the answer, along with a motion for appointment of counsel.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), govern this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). That Act "circumscribe[d]" the standard of review federal courts must apply when

considering an application for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

> As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams*, 529 U.S. at 409) (internal quotes omitted). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11; *see also Harbison v. Bell*, 408 F.3d 823, 828 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc); *Lewis v. Wilkinson*, 307 F.3d 413, 418 (6th Cir. 2002).

A.

The petitioner contends that his rights under the Due Process Clause were violated because the trial judge behaved like a prosecutor and called Paula Lytle as his own witness, questioning her in a manner that bolstered the testimony of the prosecution's DNA expert. The state court of appeals

found the trial judge's actions improper because they bespoke of judicial bias. That court commented as follows:

> The trial court called Ms. Lytle to provide additional background information regarding the forensic evidence presented and to demonstrate the accuracy of her department's work. We believe such questions by the trial judge, in the presence of the jury, could only be interpreted as bolstering the plaintiff's evidence. Thus, we find that the trial court crossed the line of judicial impartiality.

*People v. Wallace*, 2001 WL 1512081, at *2.

This holding is consistent with federal law. The Due Process Clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. *See Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). Judicial misconduct claims impugning the impartiality of the judge can involve two types of cases. One group addresses charges of "judicial bias" stemming from a trial judge's "personal interest" in the outcome of a case, usually derived from some extrajudicial association with the cause or with one of the parties. *See In re Murchison*, 349 U.S. 133, 136 (1955). The second group concerns charges of "judicial misconduct" in which the trial judge is accused of conducting the proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case or otherwise favors the prosecution. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994); *see also Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002), *cert. den.* 124 S. Ct. 99 (2003).

The present case falls in the latter category. To state a claim that a judge improperly favors the prosecution, a petitioner must show either actual bias or the appearance of bias creating a conclusive presumption of actual bias. *See United States v. Lowe*, 106 F.3d 1498, 1504 (6th Cir. 1997). Adverse rulings are not themselves sufficient to establish bias or prejudice that will disqualify a judge. *See, e.g., Hence v. Smith*, 49 F. Supp. 2d 547, 549 (E.D. Mich. 1999). To violate

a petitioner's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial must be significant and must be adverse to the petitioner to a substantial degree. *See McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985); *see also Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (stating that a state trial judge's behavior must render the trial fundamentally unfair to warrant habeas relief).

That a trial judge may call a witness on his own or question witnesses that appear before him or her is beyond debate. But there are limits on the extent of permissible trial court intervention. The Sixth Circuit has observed:

> The presiding judge should conduct a trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties. He must see that the issues are not obscured and that the testimony is not misunderstood. The trial court has the right to interrogate witnesses for this purpose.
> The presiding judge, however, must be careful to always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury. The basic requirement is one of impartiality and [sic] demeanor as well as in actions.

*United States v. Dandy*, 998 F.2d 1344, 1354 (6th Cir. 1993) (internal quotes and citations omitted). Once the trial judge pierces the veil of judicial impartiality, bias infects the proceedings and the Due Process Clause is offended.

The state court of appeals found that the trial judge trenched onto forbidden territory when he called and questioned an unlisted expert witness in violation of his own sequestration order who bolstered the prosecution's DNA witness. However, the state court of appeals' resort to the harmless error rule to save this prosecution was contrary to federal law.

The Supreme Court has held that judicial bias is a structural error that can never be found to be harmless. *Chapman v. California*, 386 U.S. 18, 23 & n.8, (1966) (stating that the right to an impartial judge is a constitutional right "so basic to a fair trial that [its] infraction can never be treated as harmless error"). The Sixth Circuit has stated:

> Because judicial bias infects the entire trial process it is not subject to harmless error review. . . . Instead, the court is required to assess whether the actions of the judge rose to the level of judicial bias. If the court determines that the actions resulted in a constitutional violation, then the court is required to overturn the state court decision.

*Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000) (citation omitted).

Certainly, the trial record confirms the state court's finding that the prosecution's case was strong; but once the court determined that the trial judge's actions exhibited bias, reversal and a new trial was the only permissible consequence. For these reasons, the Court is constrained to grant the petition on that ground.

B.

The petitioner's claim that his conviction is unconstitutional because the trial court restricted defense counsel's requested *voir dire* of juror Steven Miller lacks merit.

A criminal defendant has the right to a fair and impartial jury. To secure this right, the Supreme Court has held that a defendant must have an adequate *voir dire* to identify unqualified jurors. *See Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (citing cases). However, state trial courts are granted wide discretion in conducting jury *voir dire*. *See Mu'Min v. Virginia*, 500 U.S. 415, 424-27 (1991); *Daniels v. Burke*, 83 F.3d 760, 766 (6th Cir. 1996). The state's obligation to impanel an impartial jury may be satisfied by less than a specific inquiry into a particular prejudice feared by the defendant. *See Ristaino v. Ross*, 424 U.S. 589, 595 (1976); *Ham v. South Carolina*, 409 U.S. 524, 527-28 (1973).

In this case, the Michigan Court of Appeals concluded that the *voir dire* "was sufficient to serve its constitutional purpose" and the trial court's restriction on additional *voir dire* of the juror

did not deny the petitioner a fair trial. *See People v. Wallace*, 2001 WL 1512081, at *1. That decision is neither contrary to nor an unreasonable application of Supreme Court precedent. The trial court acted within its discretion in refusing to allow defense counsel to further question juror Miller after having passed him for cause. The defense and prosecuting attorneys asked different questions and received different answers. The State attorney's question concerned whether the juror's family members had been victims and the defense counsel question concerned whether the juror had experience "with a child who is alleged to have been sexually abused." Trial Tr. Vol. I at 114. The questioning provided both counsel with sufficient information to articulate a challenge to the juror for cause and to intelligently exercise their peremptory challenges. The petitioner had the opportunity to exercise a peremptory challenge to excuse juror Miller but elected not to do so. The petitioner has not shown that he was denied a fair and impartial jury by the trial court's actions. The state court's decision rejecting the petitioner's claim is neither contrary to nor an unreasonable application of Supreme Court precedent.

### C.

The petitioner also asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the prosecutor's cross-examination of him referencing statements protected by the marital communication privilege. The Court disagrees.

To show a violation of the right to effective assistance of counsel, a petitioner must establish two components: first that his attorney's performance was deficient "in that it fell below an objective standard of reasonableness," *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Strickland v. Washington,* 466 U.S. 668, 687 (1984)); second, a demonstration of prejudice, that is, a showing that counsel's deficient performance may have altered the results of the trial. *Ibid.*

An attorney's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Also, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687. Stated another way, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Cyars v. Hofbauer*, 383 F.3d 485, 491 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 686).

Although the state court of appeals did not refer to *Strickland* by name, it articulated the correct constitutional test and determined that defense counsel's failure to object to the prosecutor's line of questioning did not deprive the petitioner of the effective assistance of counsel because the petitioner failed to show that he was prejudiced by counsel's conduct. *See People v. Wallace*, 2001 WL 1512081, at *3.

This Court concludes that the Michigan Court of Appeals' decision conforms with and reasonably applies *Strickland*. Even assuming that defense counsel erred in failing to object to the prosecutor's questions, the petitioner cannot establish that he was prejudiced by counsel's conduct.

The petitioner testified that he could not recall having any such conversation with his wife and his wife did not testify at trial. Therefore, no confidential marital communications were received in evidence. The trial court specifically instructed the jurors that the attorneys' questions and comments were not evidence. Moreover, the evidence against the petitioner, which included the eleven-year-old victim's testimony and the DNA evidence, was overwhelming. The state court of appeals properly concluded that the petitioner did not show that he was prejudiced by his attorney's conduct. When a criminal defendant cannot prevail on the prejudice component of the ineffective assistance of counsel test, it is not necessary to assess the quality of trial or appellate counsels' performance. *Cyars*, 383 F.3d at 491 (citing *Strickland*, 466 U.S. at 687) (explaining "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"). Therefore, the state court's decision rejecting the petitioner's claim is neither contrary to nor an unreasonable application of *Strickland*.

### III.

The Court concludes that the petitioner is entitled to federal habeas relief on the judicial bias claim contained in his petition and no other.

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is conditionally **GRANTED**.

It is further **ORDERED** that the caption in this case is amended to substitute the petitioner's present custodian, Thomas K. Bell, in place of the original respondent, David Jamrog.

It is further **ORDERED** that the petitioner's motion for appointment of counsel [dkt # 25] is **DENIED** as moot.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days, subject to the exclusions from such period allowed by 18 U.S.C. § 3161(h).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 31, 2005

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 31, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS

---